**Leaton GUINN, Appellee,**

v.

**KANSAS CITY SOUTHERN RAILWAY COMPANY, a corporation, Appellant.**

**No. 47517.**

Court of Appeals of Oklahoma,
Division No. 1.

Oct. 28, 1975.

Rehearing Denied Dec. 9, 1975.

Certiorari Denied March 23, 1976.

Released for Publication by Order of Court of Appeals March 25, 1976.

James E. Driscoll, Seminole, and Sullivan & Sanders by Douglas W. Sanders, Poteau, for appellee.

Watts, Looney, Nichols, Johnson & Hayes by Burton J. Johnson, Oklahoma City, for appellant.

ROMANG, Presiding Judge:

Leaton Guinn was injured while working as a brakeman for Kansas City Southern Railway Company. Guinn brought this action for damages under the section of the Safety Appliance Act which requires railroads to use automatic couplers. (45 U.S. C.A. § 2) The trial court instructed the jury that the Railway Company was liable for Guinn's injuries, and left it to them to fix the amount of damages. The resultant verdict fixed the amount of the plaintiff's recovery at $162,500. The Railway Company appeals, asserting that it was error for the trial court to direct a verdict on the question of liability, and arguing that its demurrer to the evidence should have been sustained. The Railway further contends that the trial court improperly coerced the jury, permitted an improper use of interrogatories, and erred in admitting certain opinion evidence. We disagree and affirm the judgment of the trial court.

On June 28, 1972, Leaton Guinn left Heavener, Oklahoma as the head brakeman on a train bound for Watts, Oklahoma. The train consisted of approximately 95 cars, and was pulled by four locomotives, Guinn was riding in the forward locomotive.

At a point about ninety miles from Heavener, while traveling approximately twenty-five miles per hour, the train entered a curve to the right. It was Guinn's duty as brakeman to watch the cars in the train for any indication of malfunction, and the curve to the right provided an opportunity to observe the cars from the right side of the locomotive.

As he was looking back at the train he heard the sound of air rapidly escaping from the train's braking system. At about the same time, he saw the train's forward car was parting or falling behind the rearward locomotive, to which it had been coupled.

The braking system on such a train is controlled by compressed air. This air is compressed in the locomotive, and is piped back through the cars through a series of pipes and hoses to the caboose. To promote safety, the brake system on this and other trains is constructed in such a way that the brakes on each car are "on" unless and until there is sufficient air pressure in the line to force them "off." In the event of a break in the air line, (or train line as it is called) the loss of pressure causes the brakes on each car and engine to press against the wheels. The train is then said to "go into emergency."

When Guinn heard the sound of air excaping, he knew that the train was going into emergency. At about the same time he saw a widening gap between the last locomotive and the first car. He realized also that it was likely that the trailing cars would shortly catch up and collide with the locomotives. The locomotives stopped and the rest of the train ran into them. Although he braced himself, when the impact came Guinn was thrown to the floor.

Guinn had had a number of previous episodes of back trouble, and he testified that he felt pain from the time of this occurrence to the time of trial. An examination by the train crew at the scene disclosed three breaks in the train line, and a broken knuckle on the coupler connecting the first car to the draw bar of the locomotive which had been pulling it.

Guinn based his action on that part of the Safety Appliance Act (45 U.S.C.A. § 2) which provides that

". . . It shall be unlawful for any common carrier engaged in interstate commerce by railroad to haul or permit to be hauled or used on its line, any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars." .

Though the language of this section would seem merely to require couplers that close on impact and which can be uncoupled without men going between cars, courts have long construed this act as requiring couplers that hold together. *O'Donnell v. Elgin, Joliet & Eastern Railway Co.*, 338 U.S. 384, 70 S.Ct. 200, 94 L. Ed. 187 (1949); *Kennan v. Director General of Railroads,* (2nd Cir., N.Y.1922) 285 F. 286.

■ The Supreme Court of the United States pointed out in the O'Donnell case (supra) referring specifically to couplers, that

". . . a failure of equipment to perform as required by the Safety Appliance Act is in itself an actionable wrong, in no way dependent upon negligence and for the proximate results of which there is liability—a liability which cannot be escaped by proof of care or diligence. . . ."

and at 338 U.S. 393, at 70 S.Ct. 206;

". . . the Act certainly requires equipment that will withstand the stress and strain of all ordinary operation, grades, loadings, stops and starts, *including emergency stops*. A defendant cannot escape liability for a coupler's inadequacy by showing that too much was demanded of it, . . .." (Emphasis ours.)

This language is clear, unambiguous, pertinent and under the Supremacy Clause, Section VI of the United States Constitution, it is binding upon the state court in which the case is tried. The *O'Donnell* case has been followed consistently and we have found no intimation of any retreat by the court from the position announced therein in 1949.

■ The Railway argues, however, that there was evidence which tended to show

that the cause of Guinn's injury was the break in the train line rather than the breaking of the coupler, and that the jury should have been permitted to decide the question of causation, and further, in fact, that the evidence showed conclusively that the broken train line was the cause of the damage, and that, since Guinn had based his case solely and exclusively on the quoted section of the Safety Appliance Act, a demurrer to the plaintiff's evidence should have been sustained.

We think that the construction of the Act set out above makes the question whether the train line or the coupler first malfunctioned immaterial. Although it may be a defense if a saboteur or a colliding automobile or other intervening cause brought about the failure of the coupler, it is no defense that the failure of the coupler was caused by the Railway's own equipment. The fact is that the coupler failed, and from that fact liability inevitably follows unless the intervention of some outside, supervenient cause can be demonstrated. There was no evidence of any such cause in this case. Guinn testified that his pain began at the time of the accident, and this evidence was never contradicted. There was, therefore, nothing for the jury to decide except the extent of the damages.

▮ The Railway next contends that the trial court coerced a verdict by sequestering the jury, and holding them incommunicado for an unreasonably long time. The record does not support this contention.

The case went to the jury at 11:30 a.m. The jury was sequestered and taken to lunch at 1:00 p.m. in the charge of the bailiff after being instructed not to visit with other persons while at the cafe. After lunch they deliberated further, and at 4:00 p.m. the jury was re-called to the court room and the foreman was asked if he thought a verdict could be reached. The foreman said he did not believe they

could *that day*. The Court nevertheless sent the jury back for further deliberation. It was raining outside. At 5:30 p.m. the jury reported that they were divided 8 to 4. They were taken out for dinner, but no telephone calls were permitted. The 9 to 3 verdict in favor of the plaintiff was returned at 7:40 p.m. Some confusion arose because some members of the jury had signed the verdict form prepared for use in the event of a defendant's verdict, but marked "VOID" by one of the jurors when the mistake was discovered. These facts were established by questioning of the jurors by the Court at the time the verdict was returned.

There is a strong tradition in Anglo-American jurisprudence that a jury should be instructed on the law, but free from judicial influence as to the facts, and independent in its deliberations. Our forebears were outraged by the King's judge in the trial of William Penn, who told the jury,

> "I will have a positive verdict or you shall starve for it . . . Till now I never understood the reason of the policy and jurisprudence of the Spaniards, in suffering the inquisition among them: And certainly it will never be well with us, 'till something like the Spanish inquisition be in England."[1]

We scrutinize the action of the trial judge very carefully for evidence of intimidation or coercion. We find none. We find a very careful effort to assure that the jury would not be exposed to any outside influence, and a resolve that a reasonable attempt be made to reach agreement. There may have been a certain lack of consideration for the members of the jury in not permitting telephone calls to family members, but this certainly does not amount to coercion. 12 O.S.1971, § 580 relating to the jury provides in part as follows:

> ". . . [T]hey must be kept together . . . subject to the discretion of

1. Trial of William Penn and William Mead, 6 Howells State Trials 951 (1670) as edited

2 Chafee, Documents on Fundamental Human Rights 306 (1951).

the court to permit them to separate temporarily at night and at their meals. The officer . . . shall not suffer any communication to be made to them . . .."

We find the action of the trial judge to be in complete conformity with this statute.

■ The defendant Railway Company next contends that the trial court erroneously permitted the plaintiff to read certain interrogatories to the jury. The Railway Company argues correctly that the answers to interrogatories may be used to the same extent as depositions, 12 O.S.1971, § 549, and that where the witness is a party to the action (or its servant, agent or employee) whose deposition has been taken and who is present at the trial, but does not testify, a deposition of that witness may be used only if it contains admissions against the interest of the party on trial. 12 O.S.1971, § 447. The railroad argues that certain of the interrogatories read to the jury to which objection was duly made did not contain such admissions against interest. We agree. A typical example of this is the interrogatory,

Q "Was there an inspection to reveal if all parts of the braking equipment was secure?

A Yes."

There were several interrogatories concerning inspections the railroad was required to make. In each case an answer indicated the inspection was made. These are not admissions against interest, but it is very difficult to see how the railroad was prejudiced in any way by such interrogatories as these. Reading these may unnecessarily have taken up time in court, but we think the answers helped rather than hurt the railroad, and we will not reverse the judgment in the absence of some showing of prejudice resulting from the trial court's action. In another interrogatory the railroad admitted that a knuckle on the coupler broke. We think this was clearly an admission against interest, in view of the applicable law in this case, and

therefore admissible. In short, our examination of the record indicates that all of the interrogatories read were either admissible as admissions against interest or were actually helpful to the Railway Company.

■ The Railway Company next complains of the testimony of the witness Cecil Thornley. This witness testified that he was an agent for Prudential Insurance Company of America, and that he had been with that company for 19 years. He was then permitted to testify that the cost of a single premium immediate annuity policy which would pay $929.00 per month based upon the life expectancy of a 55 year old man would be $165,000. Testimony of this character, and in fact, of this very witness, has been approved by the Supreme Court of the State of Oklahoma. *Missouri-Kansas-Texas Railroad Company v. Miller,* (Okl.1971) 486 P.2d 630, 636; *St. Louis-San Francisco Railway Company v. King,* (Okl.1954) 278 P.2d 845, 850. Though we are concerned here with federally created substantive rights, procedural matters, such as the admissibility of evidence, are governed by the law of the forum, *St. Louis-San Francisco Railway Company v. King* (supra); *Joice v. Missouri-Kansas-Texas Railway Co.,* 354 Mo. 439, 189 S.W.2d 568, 161 A.L.R. 383, and the cited decisions of the Oklahoma Supreme Court are conclusive upon us.

■ But the Railway Company contends that error was committed when the witness was permitted to use the figure $929 as the monthly income figure. The figure was based on Guinn's income in 1971 and 1972. His income for 1969 and 1970 was substantially less than this. The monthly average for the entire four year period was far less than $929. This was brought out forcefully by counsel for the Railway Company on his cross-examination of Thornley. Guinn earned $10,274.96 in 1971, and $5,957.37 in the first six months of 1972. This would be an average of some $900 for the 18 month period, and $992 for the months worked in 1972. We

think the monthly income figure used was within the permissible range established by the evidence, and that the Railway Company, by cross-examination and argument, had an ample opportunity to present its version of the evidence to the jury. We agree that recovery is proper for the entire life expectancy without diminution by the likelihood of retirement.

▪ The medical doctor who attended Guinn testified about X-rays made of Guinn's spine. In the course of his testimony he explained that a myelogram is a diagnostic tool used to locate abnormal conditions in the spinal column. An iodized viscous fluid is injected into the spinal column and enables the physician to see the shape of the nerve canal on X-rays. It appeared that there was some of this fluid from a previous myelogram present on the X-rays. The witness explained the presence of this fluid. On cross examination the following questions and answers appear in the record:

"Q I am curious. If this man had a myelogram in 1970 wouldn't you say then that back in 1970 he was just about at that last stage then when they ran the myelogram?

A It is my understanding from the patient and the history that a previous myelogram had been run and that it had been reported as negative.

Q Doctor, let me see if you answered my question now. I said wouldn't it have been that it was not in those last stages that you just now referred to back in 1970 that caused them to have to run that myelogram then? Would you say that answer would be true?

A A myelogram was done. Now the merits of why it was done was not part of my history."

The Railway Company argues that it was error to permit this testimony because it was hearsay and the X-rays upon which it was based were not admitted in evidence.

We think it is a sufficient answer to say that the testimony was elicited on cross examination and no objection was made at the time.

A supersedeas bond having been filed and approved herein, judgment is hereby rendered in accordance with 12 O.S.1971, § 971 in favor of the appellee Leaton Guinn against the surety St. Paul Fire & Marine Insurance Company, for the sum of $170,137.50 with interest at the rate of 10% per annum from the 18th day of March, 1974 until paid and all court costs.

AFFIRMED.

REYNOLDS, J., concurs.